09-2819-cr
United States v. Graham

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2011

(Argued: October 20, 2011)     Decided: August 15, 2012)

No. 09-2819-cr

_____

UNITED STATES OF AMERICA,
*Appellee,*


-v.-


LARONE GRAHAM, also known as ABGOD GRAHAM,
*Defendant-Appellant.*

_____

Before:     CABRANES, LIVINGSTON, and CARNEY, *Circuit Judges.*


Defendant-Appellant Larone Graham, a/k/a Abgod Graham ("Graham"), appeals from a June 17, 2009, judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*) convicting him, following a jury trial, of conspiracy to affect commerce by robbery, affecting commerce by robbery, conspiracy to affect commerce by extortion, and affecting commerce by extortion, all in violation of the Hobbs Act, 18 U.S.C. § 1951; discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and using an explosive to commit a felony, in violation of 18 U.S.C. § 844(h)(1). The district court sentenced Graham principally to a term of imprisonment of 600 months and five years of supervised release. Graham's sentence included two consecutive, mandatory 10-year terms, on the theory that his discharge of a single bullet from a 9 millimeter semiautomatic pistol in furtherance of the crime of extortion constituted both a violation of 18 U.S.C. § 924(c)(1)(A)(iii) and a violation of 18 U.S.C. § 844(h)(1). On appeal, Graham argues that the cartridge in his semiautomatic pistol did not constitute an "explosive" for purposes of 18 U.S.C. § 844(h)(1), and therefore that his conviction under that statute pursuant to Count Eleven of the Superseding Indictment must be

reversed.  We agree.  Accordingly, we REVERSE the district court's judgment as to Count Eleven, convicting Graham of a violation of 18 U.S.C. § 844(h)(1), without reaching the other challenges that Graham makes as to Count Eleven.  In an accompanying summary order filed today, we reject Graham's remaining challenges to his conviction on the other counts and AFFIRM as to all remaining counts.  The matter is REMANDED for resentencing on these affirmed counts of conviction.

DONNA R. NEWMAN, Buttermore Newman Delanney & Foltz, LLP, New York, NY, *for Defendant-Appellant*.

LARA TREINIS GATZ, Assistant United States Attorney (Jo Ann M. Navickas, Assistant United States Attorney, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

LIVINGSTON, *Circuit Judge*:

This case presents the question of whether the discharge of a cartridge from a 9-millimeter semiautomatic pistol constitutes the use of an "explosive" for purposes of 18 U.S.C. § 844(h)(1).  For the reasons that follow, we conclude that it does not.

Defendant-Appellant Larone Graham, a/k/a Abgod Graham ("Graham"), appeals from a June 17, 2009, judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*) sentencing him principally to a total of 50 years' imprisonment and five years' supervised release, following his conviction, upon a jury trial, of: conspiracy to affect commerce by robbery, in

violation of 18 U.S.C. § 1951(a); affecting commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; conspiracy to affect commerce by extortion, in violation of 18 U.S.C. § 1951(a); affecting commerce by extortion, in violation of 18 U.S.C. § 1951(a) and 2; discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and using an explosive to commit a felony, in violation of 18 U.S.C. § 844(h)(1). Graham's 50-year sentence included two consecutive, mandatory 10-year terms of imprisonment for the violations of 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 844(h)(1), both based on Graham's firing of a gun at the ground next to the victim of his extortion.

On appeal, Graham argues principally that his conviction on Count Eleven of the Superseding Indictment for use of an explosive to commit a felony, in violation of 18 U.S.C. § 844(h)(1), should be reversed because the cartridge in the 9-millimeter semiautomatic pistol he discharged during the course of his extortion does not constitute an "explosive" for purposes of the statute.[1] In the

---

[1] 18 U.S.C. § 844(h) provides that

> [w]hoever —
>
> > (1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or
> > (2) carries an explosive during the commission of any felony which may be prosecuted in a court of the United States,

alternative, Graham argues that convicting him for one act of discharging a gun in furtherance of extortion under both 18 U.S.C. § 844(h)(1), the explosives statute, and 18 U.S.C. § 924(c)(1)(A)(iii), the statute punishing the discharge of a firearm used or carried during and in relation to a crime of violence, constitutes multiple punishments for the same offense and therefore violates the Double Jeopardy Clause of the Fifth Amendment, U.S. CONST. amend. V.[2]

---

> including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years. In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried.

[2] 18 U.S.C. § 924(c)(1)(A) provides that

> [e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the

For the reasons stated below, we conclude that the term "explosive" in 18 U.S.C. § 844(h)(1) does not include within its ambit the cartridge in the 9-millimeter semiautomatic pistol used by Graham. Accordingly, we reverse the judgment of the district court on Count Eleven of the Superseding Indictment.[3] In an accompanying summary order filed today, we reject Graham's remaining challenges to his conviction. Accordingly, we reverse his conviction on Count

punishment provided for such crime of violence or drug trafficking crime —

(i) be sentenced to a term of imprisonment of not less than 5 years;
(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

A "crime of violence" is defined as an offense that is a felony under United States law and:

"(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

18 U.S.C. § 924(c)(3).

[3] In light of this disposition, we need not address Graham's arguments that 18 U.S.C. § 844(h)(1) is void for vagueness as applied to him; that his convictions under both 18 U.S.C. § 844(h)(1) and 18 U.S.C. § 924(c)(1)(A)(iii) constitute multiple punishments for the same offense, in violation of the Double Jeopardy Clause; and that the evidence presented at trial was insufficient to convict him of a violation of 18 U.S.C. § 844(h)(1).

Eleven, affirm his conviction on Counts One, Two, Three, Five, Six, Seven, and Ten, and remand for *de novo* resentencing on these affirmed counts, *see United States v. Rigas*, 583 F.3d 108, 115–119 (2d Cir. 2009) (citing *United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002)).

## BACKGROUND

### I. Offense Conduct

The following background relates to the conduct charged in Count Eleven of the Superseding Indictment and is taken from the testimony at trial.

Graham was the leader of a group of violent robbers associated with the Louis H. Pink Houses (the "Pink Houses"), a public housing project in Brooklyn, New York. The group, which was sometimes known as the "Pink Houses Group," carried out robberies of jewelry and specialty stores, collecting, among other things, jewelry, cash, and fur coats. After Graham's henchmen completed the robberies, they would often gather in the parking lot of the Pink Houses and distribute the loot amongst themselves and to Graham, their leader.

On December 3, 2003, members of the Pink Houses Group robbed the Diamond Oro jewelry store at Broadway and 144th Street in Manhattan. The group was led by Graham's lieutenant, Kareem Davis ("Davis") and included Pink Houses Group member Tyrone Redrick ("Redrick") and Jamel Thompson ("Thompson"), a member of another gang known as NFL. Following this

successful armed robbery, the robbers drove back to Brooklyn, stopping briefly to drop Thompson off at his girlfriend's home. There, Thompson examined the jewelry he had taken, electing to keep a few items for himself. These items included a gold, diamond-encrusted ornament depicting the head of Jesus Christ and referred to at trial as the "Jesus head." Thompson put the remaining jewelry into a bag.

Later that same day, Thompson called NFL's leader, Michael Harriston ("Harriston"), and explained that he had just executed a robbery with members of the Pink Houses Group and would give Harriston some of the jewelry he had stolen. The two men drove to Thompson's house, where Thompson retrieved the Jesus head and gave it to Harriston in exchange for a diamond ring.

That night, a group that included Graham, Davis, and other Pink Houses Group members met in the Pink Houses parking lot with Thompson. Thompson handed the bag of jewelry (less the items he had removed) over to the group. After reviewing the contents of the bag, Graham indicated that he was disappointed in the loot and that Thompson had "botched up the job." After this meeting, Graham and Davis became suspicious that Thompson had taken jewelry for himself without the group's knowledge when Thompson stopped at his house on the way back from the robbery. Davis called Thompson, who admitted that he had taken jewelry from the robbery, pawned it, and purchased a white Acura with the proceeds.

7

Graham discussed Thompson's theft from the group with Davis and indicated that he wanted to go find Thompson and make him give back the jewelry he had taken for himself. Graham (accompanied by other members of the group) located Thompson at a barber shop. After doing so, Graham forced Thompson to get into Graham's vehicle by, *inter alia*, firing a single shot into the ground with a 9-millimeter pistol when Thompson appeared ready to flee the scene.

The group drove to a pier in Far Rockaway, Queens; during the drive, Thompson told Graham and the others that he had given the Jesus head to Harriston in exchange for a ring. At the pier, Graham and his lieutenants threatened Thompson, who promised (at gunpoint) that he would pay back his debt to the Pink Houses Group if he was allowed to live. The group then drove back to the Pink Houses and, later that night, released Thompson on the condition that he commit more robberies to "make it up" to them

The group convened at a gas station on Atlantic Avenue in Brooklyn the next day to plan a robbery that Thompson would commit to repay his debt. Graham provided Thompson with a Mac-10 to commit the robbery and directed him to rob a jewelry store on Canal Street in Manhattan. Though Thompson ultimately did not commit the robbery due to the presence of a traffic policeman and a crowd of people around the store, later that same day or the next day

Redrick saw Graham wearing the Jesus head that had been stolen from the Diamond Oro.

## II.    *Proceedings in the District Court*

As relevant here, Graham was indicted on the following charges: Count Five, conspiracy to extort Thompson, in violation of 18 U.S.C. §§ 1951(a) and 3551 *et seq.*; Count Six, extortion of Thompson, in violation of 18 U.S.C. §§ 1951(a), 2 and 3551 *et seq.*; Count Ten, discharging a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 2 and 3551 *et seq.*; and Count Eleven, using an explosive to commit a felony, in violation of 18 U.S.C. §§ 844(h)(1), 2 and 3551 *et seq.*[4] Count Ten charged that Graham was subject to a mandatory consecutive 10-year prison term for discharging the 9-millimeter semiautomatic into the ground during and in relation to the extortion of

---

[4] Graham was also charged in the following counts: Count One, conspiracy to commit a robbery of a jewelry store on Canal Street, in violation of 18 U.S.C. §§ 1951(a) and 3551 *et seq.*; Count Two, conspiracy to rob the Cellini Uomo clothing store, in violation of 18 U.S.C. §§ 1951(a) and 3551 *et seq.*; Count Three, robbery of the Cellini Uomo clothing store, in violation of 18 U.S.C. §§ 1951(a), 2 and 3551 *et seq.*; Count Four, attempted robbery of a jewelry store on Canal Street, in violation of 18 U.S.C. §§ 1951(a), 2 and 3551 *et seq.*; Count Seven, conspiracy to rob an international jeweler, in violation of 18 U.S.C. §§ 1951(a) and 3551 *et seq.*; Count Eight, use and carrying of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i), 2 and 3551 *et seq.*; Count Nine, brandishing a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 2 and 3551 *et seq.*; and Count Twelve, possession of a firearm during the shooting of Steven Morris, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3551 *et seq.*

Thompson, while Count Eleven charged that the cartridge in the gun constituted an explosive used by Thompson to commit the extortion, for which he was also liable for a mandatory consecutive 10-year term.

Trial began on January 3, 2007. Agent John McKenna ("McKenna") of the Bureau of Alcohol, Tobacco and Firearms ("ATF") testified for the Government regarding how firearms and ammunition work. McKenna explained the mechanics of a semiautomatic pistol of the type fired by Graham during the extortion of Thompson:

> When you pull the trigger, the mechanics . . . will cause a hammer to fall, which will cause a firing pin to move forward, strike the rear of the ammunition, and in striking the rear of the ammunition, it will strike an area called the primer, which contains very volatile explosive material in it. So just the mere friction of it will cause a reaction and a fire.
>
> From there, that primer will then light a propellant powder that is in the casing area. That . . . propellant powder . . . will burn very, very rapidly and create a lot of gas and heat. The gas is now looking for an area to escape, and it will cause the projectile at the top of the ammunition, the bullet, to then exit the firearm down the barrel and then out the firearm.

McKenna characterized this process as a "mini-explosion" within the bullet.

On February 16, 2007, the jury returned a verdict of guilty on Counts Five, Six, Ten, and Eleven of the Indictment, regarding the Thompson extortion. The jury also found Graham guilty of Counts One, Two, Three, and Seven, acquitting him as to Counts Four, Eight, Nine, and Twelve.

10

With regard to Counts Five, Six, and Eleven, Graham moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.[5]  Def.-Appellant's Rule 29 Motion, at 1 (Apr. 23, 2007).  Graham argued, *inter alia*, that 18 U.S.C. § 844(h)(1) "was never intended to prosecute the commonplace act of discharging a firearm," *id*. at 7, and that if applicable in this context, § 844(h)(1) was unconstitutionally vague as applied because "the term explosive is being applied to the common and legal item, a bullet, and legally permissible conduct, discharging a firearm," *id*. at 8.

The Government responded that the plain language of the statute includes ammunition because the definition of "explosive" in 18 U.S.C. § 844(j) refers to "gunpowders and the various ignition methods which comport with the way ammunition functions."[6]  Gov't Opp'n to Rule 29 Motion, at 7 (July 12, 2007).

---

[5] In his Rule 29 motion, Graham also argued that the evidence was insufficient as to Counts Two and Three.

[6] 18 U.S.C. § 844(j) defines "explosive" for the purpose of § 844(h).  It provides in relevant part that the term "explosive" means:

> gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders. . . and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

The Government further argued that ammunition is explicitly excluded from § 844(g), a nearby subsection of § 844 that prohibits the possession of an explosive in an airport, thereby indicating that ammunition is not excluded from the definition of "explosive" applicable to § 844(h)(1). *Id.* Finally, the Government pointed out that 18 U.S.C. § 845, a section of the Explosives Act listing exceptions to the Act's applicability, provides that "small arms ammunition and components thereof" are excepted from some applications of the Act, but not from the ambit of § 844(h). *Id.* at 7-8.

The district court heard oral argument on Graham's Rule 29 motion at a July 27, 2007, hearing. It began by inquiring of the Government as to whether it had charged a violation of § 844(h)(1) based on the discharge of a firearm during the commission of a felony in any other case. Rule 29 Trns., at 3. The Government replied that the only instance of which it was aware in the Eastern District in which the Government had prosecuted the discharge of a firearm under § 844(h)(1) had ended in dismissal of the charge, and that "there is no appellate law" on the issue of whether § 844(h)(1) covers the gunpowder in a cartridge. *Id.* at 2-3. Graham's counsel argued that the inclusion of a cartridge under § 844(h)(1) "is beyond Congress' intent" and that "a single shot" from Graham's firearm was not an "explosive" because it was not in "such proportions, quantities, or packaging" as to fit within the definition of "explosive." *Id.* at 4.

12

After hearing argument, the district court rejected Graham's Rule 29 arguments and denied the motion "in its entirety." *Id.* at 7.

By a judgment of June 17, 2009, the district court sentenced Graham to 600 months in prison, to be followed by five years' supervised release, and ordered Graham to make restitution in the amount of $130,550.00. Graham's 600-month sentence included a consecutive, 10-year mandatory term on each of his convictions under 18 U.S.C. § 844(h)(1) and 18 U.S.C. § 924(c)(1)(A)(iii). This appeal followed.

## DISCUSSION

This case presents the question of whether the discharge of a cartridge from a 9-millimeter semiautomatic pistol during the commission of an extortion implicates not only the 10-year mandatory sentence in § 924(c)(1)(A)(iii) of the Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1224, codified as amended at 18 U.S.C. § 924(c) (2000 ed. and Supp. V), prohibiting the discharge of a firearm used or carried "during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States," but also the mandatory 10-year term provided for in 18 U.S.C. § 844(h)(1) of the Explosives Control Act, enacted as Title XI of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1102, 84 Stat. 922, 952 (1970) codified at 18 U.S.C. § 841 *et seq.*, which prohibits the use of an

13

explosive to commit any felony which may be federally prosecuted. We review this question *de novo*. *See United States v. Mazza-Alaluf*, 621 F.3d 205, 209 (2d Cir. 2010). Graham argues that the cartridge he discharged during Thompson's extortion does not fall within the meaning of "explosive" as used in § 844(h)(1). We agree.

\*     \*     \*

The Explosives Control Act both regulates explosives "by controlling [their] distribution, transportation and storage" and criminalizes conduct related to explosives "by providing criminal penalties for their intentional misuse." *United States v. Lorence*, 706 F.2d 512, 514–515 (5th Cir. 1983). We begin, as we must, with the Act's text. In conducting statutory analysis, we review "the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme." *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009) (internal quotation marks omitted); *see also County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (noting that statutory language is read "in light of the surrounding language and framework of the statute"). A text's plain meaning "can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003). Statutory construction, as

14

the Supreme Court has said, "is a holistic endeavor" in which the meaning of a superficially ambiguous provision "is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

Section 844(h) provides in relevant part that

> [w]hoever . . . uses fire or an explosive to commit any felony . . . including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years. . . . Notwithstanding any other provision of law . . . the term of imprisonment imposed under this subsection [shall not] run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried.

18 U.S.C. § 844(h). The term "explosive" is defined for purposes of § 844(h) as:

> gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

18 U.S.C. § 844(j).[7]  "Explosives" are therefore "defined as falling into three categories: (1) articles like gun powder and blasting material that are commonly used as explosives; (2) explosive or incendiary devices within the meaning of 18 U.S.C. § 232(5)(C); and (3) chemical compounds or mixtures that may cause an explosion when ignited." *Lorence*, 706 F.2d at 515 (footnote omitted); *see also United States v. Hepp*, 656 F.2d 350, 352 (8th Cir. 1981) (same); *United States v. Hewitt*, 663 F.2d 1381, 1389 (11th Cir. 1981) (same).  The Government invokes two of these three categories in urging that the discharge of a firearm constitutes the use of an explosive: the first category, on the theory that the fired cartridge contained gunpowder; and the third category, on the theory that a cartridge is a device containing ingredients that, when ignited, cause an explosion.  With regard to both contentions, we disagree.

---

[7] Section 232(5) further defines the term "explosive or incendiary device" as

> (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

18 U.S.C. § 232(5).

As to the first theory, the Government is correct that firearms like Graham's 9-millimeter semiautomatic expel bullets by the combustion of gunpowder or other explosive material contained within the cartridge. *See* Black's Law Dictionary 710 (9th ed. 2009) (defining firearms). Section 844(j), however, does not specifically list either single cartridges or ammunition generally as a form of explosive falling within its ambit. Instead, it defines "explosive" to mean, in relevant part, "gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents [and] smokeless powders." 18 U.S.C. § 844(j).

As the Supreme Court has advised, "words and people are known by their companions." *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000); *id.* at 254–258 (invoking the canon *noscitur a sociis* to narrow the relevant phrase "in any election" where the phrase was closely surrounded by six specific references to gubernatorial elections); *accord Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Here, we deem it significant that the word "gunpowders" in § 844(j) appears in a list of materials that also includes high explosives, detonators, and detonating agents—all used in detonation, a particularly fierce and explosive chemical reaction "producing vigorous evolution of heat and sparks or flame and moving through the material detonated (as a high explosive such as dynamite

17

or TNT) at a speed greater than that of sound." Webster's Third New Int'l Dictionary 617 (2002). The list also includes blasting materials, commonly used for the "breaking up of heavy masses (as of rock) by means of explosives." *Id*. at 231.

To be sure, gunpowder is also a powerful explosive that can be used in blasting. And absent some indication in the text we hesitate to conclude that § 844(j) requires some minimum quantity of gunpowder to be present before it will apply. In ordinary usage, however, a person carrying a single unspent pistol cartridge in his pocket—a cartridge containing a small amount of gunpowder—is hardly deemed by virtue of this to be armed with gunpowder or an explosive. We do not think Congress intended this result, nor do we think the Government's interpretation of § 844(j)—that a single 9-millimeter cartridge falls within its definition of explosive, simply because the cartridge contains a small quantity of gunpowder—is reasonable.

This conclusion is not altered by the Government's second argument—that the cartridge in Graham's 9-millimeter weapon was, in effect, a device containing ingredients such that ignition could cause an explosion. Section 844(j) defines explosive, in relevant part, as any "chemical compound[], mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by

18

fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion."  18 U.S.C. § 844(j).  The Government argues that this definition is applicable here because, as Agent McKenna testified, a bullet fires via a "mini-explosion."  Accepting this argument, however, would mean that the getaway driver in every bank robbery would also be subject to § 844(h)—not for robbing the bank, but for using an explosive to do so.  After all, the internal combustion engine relies on a mini-explosion to produce "the hot gaseous products of combustion acting on moving surfaces of the engine, such as the face of a piston, a turbine blade, or a nozzle," that cause the engine to run.  *See* Encyclopaedia Britannica, Internal-Combustion Engine, http://www.britannica.com/EBchecked/topic/290504/internal-combustion-engine (last visited Aug. 7, 2012).  Indeed, the chamber of the engine in which the combustion process occurs is sometimes known as the "explosion chamber."  5 Oxford English Dictionary 576 (2d ed. 1991).

We do not deem the Government's construction of § 844(j) to be reasonable.  In *United States v. Gelb*, 700 F.2d 875 (2d Cir. 1983), we rejected the notion that spilled gasoline, used to set a commercial building afire, constituted an explosive for the purpose of § 844(j), simply because "chemical compounds such as gasoline may cause an explosion under certain atmospheric conditions."  *Id.* at 878.  The

19

Government, curiously, fails to cite *Gelb*, much less discuss its implications here. At any rate, we need not speculate as to the line between "mini" explosions and larger ones, nor address § 844(j)'s potential application to incendiary bullets, "intended to ignite flammable materials such as gasoline," *see* Encyclopaedia Britannica, Ammunition, http://www.britannica.com/EBchecked/topic/21113/ ammunition (last visited Aug. 7, 2012), or to ammunition generally, in order to conclude that a single 9-millimeter cartridge does not constitute an explosive for the purpose of § 844(j), simply because it may be fired from a gun.

This conclusion is confirmed by consideration of the Explosive Control Act's penalty provisions in light of those contained in the Gun Control Act. *Cf. United Sav.*, 484 U.S. at 371 (interpreting § 362(d)(1) of the Bankruptcy Code so as to "produce[ ] a substantive effect . . . compatible with the rest of the law"). In the version of § 924(c)(2) of the Gun Control Act in effect when § 844(h) was enacted, Congress mandated a term of no less than one year and no more than 10 years for anyone who "carrie[d] a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States." 18 U.S.C. § 924(c)(2) (1964 ed., Supp. IV). Section 844(h)(2) was modeled on this provision: "Except for the word 'explosive' in § 844(h)(2), instead of the word 'firearm' in § 924(c)(2), the two provisions as originally enacted were identical."

*United States v. Ressam*, 553 U.S. 272, 275 (2008). Thus, it is clear that Congress meant to establish a sentencing enhancement for use of explosives as a counterpart to the existing firearms enhancement, in order to address "an emerging social concern [with] the tragedy of lost lives and damage to property caused by . . . bombings," *Gelb*, 700 F.2d at 878. Despite the close relationship between the two provisions, however, there is no hint in the text or structure of the Explosives Control Act that Congress also intended to heighten substantially the existing firearms enhancement, so long as the firearm at issue happened to contain at least one cartridge.

As the Supreme Court pointed out in *Ressam*, moreover, Congress thereafter redrafted what was then § 924(c)(2) (the firearms enhancement) to, *inter alia*, increase its penalties, "delete[ ] the word 'unlawfully' and insert[ ] the words 'and in relation to' immediately after the word 'during.'" *Ressam,* 553 U.S. at 275. The provision was amended to apply to those who "carr[y] a firearm during and in relation to" the commission of qualifying felonies in order to allay concerns that a person could be prosecuted under this provision for committing "an entirely unrelated crime while in possession of a firearm," *id.* at 276 (internal quotation marks omitted). Section 844(h) (the explosives enhancement) was thereafter also amended to delete the word "unlawfully" but,

21

significantly, not to insert the words "in relation to," as was done with regard to § 924(c)(2). *See id.* at 276.

The Supreme Court in *Ressam* concluded from this enactment history that Congress in amending § 844(h) "did not intend to introduce a relational requirement into the explosives provision." *Id.* at 277. Accordingly, unlike § 924(c), § 844(h) applies *whenever* explosives are carried during the commission of a felony under United States law.[8] The careful distinction between explosives and firearms that the *Ressam* Court perceived Congress to have enacted in amending § 844(h), however, comes substantially undone if § 844(j), when enacted, brought a 9-millimeter cartridge within the terms of § 844(h). For if the Government's construction is correct, an individual will always be subject to the explosives enhancement for committing a felony under United States law while carrying a firearm, so long as the gun is loaded.

Nor do the difficulties with the Government's construction end there. Congress in 1984 confined the heightened penalties applicable pursuant to § 924(c) to those who use or carry firearms during and in relation to crimes of

---

[8] As previously noted, *see supra* note 1, § 844(h)(2) provides an enhanced penalty not only for those who *use* explosives in committing such a felony, but also for those who *carry* them "during the commission of any felony which may be prosecuted in a court of the United States." 18 U.S.C. § 844(h)(2).

violence, thereafter also making them applicable in the context of drug trafficking crimes. Section 844(h), however, applies to those who use explosives to commit *any* felony under United States law, or who carry explosives during the commission of such a crime. Indeed, pursuant to the Government's construction, if an individual merely happened to have a pistol *cartridge* in his pocket during the commission of any felony under United States law (including, one may suppose, telemarketing fraud, 18 U.S.C. §§ 2325–26; software piracy, 18 U.S.C. § 2319; and illicitly cutting and removing timber on public land, 18 U.S.C. § 641), he thereby triggers the Explosives Act's 10-year mandatory consecutive term in addition to whatever penalty he might receive for the underlying crime. Again, however, carefully limiting the reach of the Gun Control Act's enhanced penalties makes little sense if the possession of a loaded firearm automatically triggers the sentencing enhancement in the Explosives Act. And the Government's construction—that a person like Graham triggers application of *both* § 924(c)(1)(A)(iii) and § 844(h)—produces the very odd result that a bank robber armed only with a pistol, who shoots it once into the air to intimidate the bank's customers, could be punished *more* severely—10 years more severely, to be exact—than a robber who uses a flask of nitroglycerin to accomplish the same result.

The Government suggests that the Fourth Circuit's decision in *United States v. Davis*, 202 F.3d 212 (4th Cir. 2000), supports its reading of the statute. Suffice it to say that the *Davis* court, which concluded that the sentencing enhancement for property damage by use of explosives, *see* USSG § 2K1.4, "includes the damage caused by projectiles discharged from a firearm," *Davis*, 202 F.3d at 220–221, was merely interpreting a sentencing guideline, and so had no occasion in its (quite brief) discussion of "explosive," *id.* at 218–219, to grapple with the relationship between the respective sentencing enhancements in § 844(h) (explosives) and § 924(c) (firearms).

The Government also relied in its opposition to Graham's Rule 29 motion on a provision of the Explosives Control Act providing for exceptions from the Act's regulatory scheme, 18 U.S.C. § 845(a). Section 845 exempts specified forms of manufacture, transport, and use of explosive material—such as certain uses in medicine, for instance—from the Explosives Control Act's regulatory scheme, but directs that these categories shall *not* be exempted from the subsections of § 844 which criminalize the use of explosives in furtherance of illegal acts (including § 844(h), the subsection at issue here). The Government argues that the exemption in § 845 for "small arms ammunition and components thereof" shows that Congress declined to exempt small arms ammunition from the ambit of § 844(h).

The Government points similarly to 18 U.S.C. § 844(g), which criminalizes the possession of an explosive in an airport, but exempts from its ambit the possession of ammunition in checked baggage.[9]  The Government argues that this exclusion clearly signifies that "explosive" includes "ammunition," or else an

[9] 18 U.S.C. § 844(g) provides in full that

> (1) Except as provided in paragraph (2), whoever possesses an explosive in an airport that is subject to the regulatory authority of the Federal Aviation Administration, or in any building in whole or in part owned, possessed, or used by, or leased to, the United States or any department or agency thereof, except with the written consent of the agency, department, or other person responsible for the management of such building or airport, shall be imprisoned for not more than five years, or fined under this title, or both.
>
> (2) The provisions of this subsection shall not be applicable to —
>
> > (A) the possession of ammunition (as that term is defined in regulations issued pursuant to this chapter) in an airport that is subject to the regulatory authority of the Federal Aviation Administration if such ammunition is either in checked baggage or in a closed container; or
> >
> > (B) the possession of an explosive in an airport if the packaging and transportation of such explosive is exempt from, or subject to and in accordance with, regulations of the Pipeline and Hazardous Materials Safety Administration for the handling of hazardous materials pursuant to chapter 51 of title 49.

exception for the possession of "ammunition" in checked baggage and closed containers would be unnecessary.

Suffice it to say that the Government's arguments are aimed at a different case than the one before us today. We do not hold here that ammunition generally (small arms or otherwise), which may conceivably be employed in quantities or in a manner far different from the single 9-millimeter cartridge discharged by Graham, cannot fall within § 844(j)'s definition of explosive, and thus trigger the § 844(h) enhancement. We decide only the case before us. We do pause, however, to note—without deciding the question—the alternative possibility that the exemptions here, though "technically unnecessary, . . . were inserted out of an abundance of caution — a drafting imprecision venerable enough to have left its mark on legal Latin (*ex abundanti cautela*)." *Fort Stewart Schs v. Fed. Labor Relations Auth.*, 495 U.S. 641, 646 (1990). At any rate, to the extent that the exemptions in § 844(g) and § 845 support the Government's reading of § 844(j), we think that this support is outweighed by the contrary arguments from text and structure set out above. Deciding only the case before us, we conclude that it is not reasonable to construe § 844(j) as including within its ambit a single 9-millimeter cartridge, simply because it contains a small amount of gunpowder and can be fired from a gun. Accordingly, we conclude that § 844(h) does not apply in the circumstances present here.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court on Count Eleven of the Indictment. In the summary order that accompanies this opinion and that is filed today, we reject Graham's challenges to his conviction on Counts One, Two, Three, Five, Six, Seven, and Ten and **AFFIRM** the judgment as to these counts. The matter is **REMANDED** for resentencing, *United States v. Rigas*, 583 F.3d 108, 115-119 (2d Cir. 2009) (citation omitted), and for further proceedings consistent with this opinion.